## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.**



SECURITIES AND EXCHANGE COMMISSION,   :

Plaintiff,   :

v.   :

JOHN R. SHREWDER; THE FRANKLIN
GROUP, INC.; and ASHLEY MIRON LESHEM,   :

Defendants,   :

**and**   :

ANANDA CAPITAL PARTNERS, INC.   :

Relief Defendant.   :

_____

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.      This action arises out of promotional campaigns to improperly increase the

volume and price of certain securities traded in the over-the counter market. Among the

several securities law violations committed in the course of this scheme, defendants John

R. Shrewder and The Franklin Group improperly manipulated the market in at least two

of these securities and inundated the public with millions of faxes ("fax blasts") that

contained materially false information in order to mislead people into buying the stocks

described. These activities resulted in several hundred thousand dollars in unlawful

profits by Shrewder. As a consultant to one of the issuers, ArTec, Inc., defendant



Leshem hired Shrewder to engage in one of these promotional campaigns in violation of a Commission Order barring Leshem from such conduct.

2.      One of the promotional campaigns referenced above started in the fall of 2004 on behalf of ArTec, Inc., a self-described pharmaceutical company whose securities trade in the over-the-counter market and are quoted on the Pink Sheets (symbol "ATKJ"). In this campaign, defendant Shrewder, using his company The Franklin Group, disseminated materially false and misleading information concerning ArTec and manipulated the market for ArTec stock in order to illegally profit by, among other things, scalping – selling ArTec shares into the rising market that their fax blasts created.

3.      In the period leading up to the ArTec campaign and thereafter, defendant Leshem acted as a paid consultant to ArTec for purposes of promoting ArTec stock in violation of a Commission Order.  In or about October, 2004, Leshem arranged for ArTec to hire and pay defendants Shrewder and The Franklin Group to promote ArTec in a manner that would increase the price and volume of ArTec's stock.  ArTec and one of its largest shareholders paid cash and stock for Leshem's consulting services.

4.      After Leshem hired Shrewder and The Franklin Group on behalf of ArTec, Shrewder and The Franklin Group utilized "fax blasts" to disseminate information to the public about ArTec.  These ArTec-related faxes sent by Shrewder contained false and misleading statements regarding: the volume of ArTec's public float; the amount and type of Shrewder's compensation; the amount of research Shrewder did about the company; the origin of the information and analysis in the faxes; and the claim that Shrewder's analysis of the stock was independent.  Shrewder also claimed in the faxes that a "third party" had retained him when, in fact, Leshem, an agent of ArTec, informed

him that ArTec's management was setting his compensation.  Finally, Shrewder sold or

"scalped" ArTec stock, which he had received as compensation for his promotional

activities, into the rising market generated in whole or in part by his own faxes and

manipulative trading.

5.      Defendants' conduct described herein violates the federal securities laws.

Unless enjoined, these defendants are likely to commit similar violations in the future.

Accordingly, the Commission seeks an order enjoining the defendants, requiring

disgorgement of ill-gotten gains and unjust enrichment, civil monetary penalties, and a

penny stock bar as to certain of the defendants.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 20 and

22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77k and 77v(a)] and

Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. §§ 78u(d), (e) and 78aa].  In connection with the conduct described herein,

each of the defendants, directly or indirectly, used the means or instrumentalities of

interstate commerce, the mails, or the facilities of a national securities exchange.

7.      Venue in this district is proper pursuant to Section 22(a) of the Securities

Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa] because

two of the four parties are located in the Southern District of Florida and acts or

transactions constituting federal securities law violations occurred within this district.

For example, defendant Leshem and relief defendant Ananda Capital Partners reside in

Boca Raton, Florida and generally conduct their operations from within this district.

ArTec's management met with Leshem in West Palm Beach and paid him his cash

3

compensation in this district, some of which was used by Leshem to pay Shrewder. Leshem placed numerous telephone calls and sent numerous e-mails to Shrewder and ArTec's management from this district. Shrewder caused fax blasts to be sent to recipients within this district. In addition, victims of Shrewder's and The Franklin Group's fraudulent scheme are located in this district and throughout Florida.

## DEFENDANTS

8.      Defendant John R. or Jay Shrewder ("Shrewder"), 46, resides in Tulsa, Oklahoma. He is a principal of The Franklin Group.

9.      Defendant The Franklin Group, Inc. ("TFG"), an Oklahoma corporation, is a marketing services company located in Tulsa, Oklahoma and operated out of Shrewder's house. Shrewder is the founder of TFG and controls it. TFG maintained the bank accounts that Shrewder used in connection with his fax blasting activities.

10.     Defendant Ashley Miron Leshem ("Leshem"), 39, resides in Boca Raton, Florida. He is a principal of Ananda Capital Partners, Inc. On March 22, 1999, the Commission issued a settled administrative order that ordered Leshem to cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; imposed a penny stock bar; and ordered Leshem to pay disgorgement of $3,000 plus interest in connection with Leshem's payment of undisclosed compensation to registered representatives to induce them to purchase stock in a particular security for customer accounts. In the Matter of Miron Leshem, File No. 3-9153 (March 22, 1999).

11.     Relief defendant Ananda Capital Partners, Inc. ("Ananda"), a Florida corporation, is a consulting firm engaged in advising public and private companies as to

business strategies.  It is operated from Leshem's house.  Leshem utilized both bank and brokerage accounts in Ananda's name for his activities relating to ArTec and Shrewder. ArTec and one of its shareholders paid Leshem's compensation to Ananda.

12.     ArTec, Inc. ("ArTec") is a Nevada corporation.  Its securities are not registered under the Exchange Act, and ArTec has never registered any securities offering under the Securities Act.  ArTec's securities are not registered on a national exchange, issued by a registered investment company, or authorized for quotation on NASDAQ.  Its common stock is quoted on the Pink Sheets under the symbol ATKJ and trades in the Over-the-Counter Market.  During the relevant time frame, ArTec's securities traded between $0.01 and $2.15.  According to ArTec's unaudited financial statements for the periods from December 31, 2003 to August 31, 2005, ArTec never exceeded $60,000 in tangible assets, had no income or sales, and thus had no revenue. ArTec is a penny stock within the meaning of the Exchange Act.

## FACTS

### I.     ArTec Hired Leshem and Shrewder To Promote Its Stock.

#### A.     ArTec Hires Leshem and Shrewder

13.     ArTec describes itself as a drug company that entered into a sublicense agreement in November of 2003 with an entity called Shinn Capital Group, Inc., to manufacture, market and distribute a non-FDA approved cancer treatment drug called Tubercin.  ArTec claims that this purported cancer treatment could be administered both intravenously and through a nasal spray.

5

14.     In August 2004, Leshem was contacted about introducing ArTec to broker-dealers that might make a market in ArTec stock. That same month, Leshem was introduced to Dr. Ronald Shinn ("Shinn"), the CEO of ArTec.

15.     On October 11, 2004, Leshem, Shinn and Gerry Knight ("Knight"), the Chief Operating Officer of ArTec, met in West Palm Beach, Florida. Leshem's role, as discussed at that meeting, was to advise ArTec as to its market, introduce it to financial public relations consultants, and generally give Shinn and Knight some operational assistance.

16.     On October 12, 2004, Leshem went to Knight's hotel room in West Palm Beach to pick up an ArTec check made payable to Ananda for $10,000. Leshem ultimately retained $5,000 of this amount as his own compensation.

17.     Thereafter, Leshem began work as a paid consultant to ArTec.

18.     In or about October of 2004, as part of his efforts to promote ArTec securities, Leshem contacted Defendant Shrewder. Leshem, Shrewder, Shinn and Knight had an initial discussion about what Shrewder's services on behalf of ArTec would entail. The services Shrewder was expected to provide were broker relations, individual investor relations, web information and direct mail. Leshem also specifically communicated to Shrewder that ArTec's goal in engaging Shrewder was to begin to increase the price and volume of ArTec stock.

19.     Most of Shrewder's actions described herein were done through his company TFG.

6

20.     From October through December of 2004, Leshem participated in negotiations among Shrewder, Shinn, and Knight to set the amount of Shrewder's compensation for his services to ArTec.

21.     On October 11, 2004, Shrewder sent an email to Leshem in which he asked for 150,000 shares of ArTec stock, or some combination of stock and cash equal to approximately $100,000, as compensation for his promotional activities.  In that message, Shrewder asked Leshem, referring to a payment of 150,000 shares of ArTec stock, "[W]hat kind of vol[ume] are they expecting for that?"  By volume, Shrewder was referring to trading volume in the common stock of ArTec generated by his promotional activities.

22.     On October 14, 2004, Leshem sent an email to Shrewder in which he stated: "What we're looking for is to get some base line volume at around $0.50-$0.55 without running it up excessively.  Hopefully average trading volume of say 30,000 shares per day initially."  Leshem added: "Dr. Shinn is a very fair guy.  If you are even moderately successful there will be incremental compensation."  Leshem closed by saying, "Also, I am introducing additional friendly market makers to provide more support."

23.     On October 15, 2004, Ananda wired $5,000 to TFG, which was one-half of the ArTec check that Ananda received from ArTec's COO.

24.     On October 19, 2004, Leshem reported back to ArTec management in an e-mail message that he and Shrewder "had an extensive discussion re[:] Kicking off the PR campaign."

25.     On October 25, 2004, Shrewder asked Leshem in an e-mail message "do [we] need the market cleaned up ie 2-3 bids @ .50 and offers around .60?"

26.      On November 3, 2004, as a result of his negotiations with Leshem and ArTec management, Shrewder received 150,000 shares of ArTec stock from an ArTec investor who was one of the six "founding fathers." The so-called "founding fathers" were the six initial major investors in ArTec. Shrewder did not pay for these shares, which at the time were worth approximately $37,500.

27.     In exchange for the receipt of 150,000 shares of ArTec stock and $5,000, Shrewder's and TFG's responsibilities included putting together a profile of ArTec and widely disseminating that profile.

### B.     Shrewder Disseminates a First Round of Fax Blasts

28.     Shrewder and TFG had a database of approximately two million fax numbers that was divided up into smaller lists. These lists were uploaded to a Canadian information technology firm ("the IT firm") that TFG hired to disseminate faxes.

29.     On November 8, 2004, 4,000 shares of ArTec traded with a closing price of $0.44 per share. On November 9, 2004, ArTec's volume was 10,000 shares with a closing price of $0.47.

30.     On November 10, 2004, at Shrewder's direction, the IT firm began disseminating the first ArTec faxes. These faxes propped up the volume and price of the stock. Volume on November 10 increased to 102,220 shares, and ArTec common stock closed at a price of $0.49.

8

31.     Between November 10, 2004 and November 23, 2004, Shrewder directed the IT firm to disseminate over 2.5 million ArTec faxes, of which over 1.5 million were successfully distributed to fax numbers in Shrewder's database.

32.     In the three weeks following this fax blast campaign, the average volume of ArTec trading substantially declined.

33.     Similarly, from November 23 to December 14, the closing price of ArTec stock dropped from $0.39 to $0.25, returning up to $0.40 after the commencement of Shrewder's second round of fax blasts.

### C.     Shrewder Engages In a Second Round of Fax Blasts.

34.     On November 18 or 19, 2004, Shrewder met with Shinn and Knight to further discuss his promotional activities for ArTec.

35.     Following the perceived success of his first round of fax blasting, Shrewder began negotiating with Leshem and ArTec management for additional compensation for another round of promotional activities.

36.     In or about early December 2004, as a result of the negotiations between Shrewder, Leshem and ArTec, an ArTec shareholder and "founding father" transferred 1,000,000 ArTec shares to Ananda.  Ananda did not pay for these shares.

37.     On or about December 13, 2004, Leshem transferred 600,000 of these 1,000,000 ArTec shares to Shrewder's brokerage account as compensation to Shrewder for another round of promotional activity on behalf of ArTec.  Neither Shrewder nor TFG paid for these shares.

38.     Leshem retained as his own compensation 300,000 of the 1,000,000 shares that the "founding father" had transferred to Ananda on or about December 6, 2004.

9

Leshem promised the other 100,000 shares to another entity that had agreed to provide services for ArTec.

39.    Shrewder commenced the second fax blast campaign on December 15, 2004. He attempted to fax approximately 800,000 copies of a third fax, and succeeded with over 450,000.

## II.    Shrewders's Faxes About ArTec Contained Material Misstatements or Omissions

### A.    The ArTec Faxes Failed to Properly Disclose the Source and Nature of Shrewder's Compensation

40.    All three versions of the ArTec-related faxes that Shrewder and TFG sent out purported to be from "the bioTech report" ("TR") and contained identical disclaimers that, "(TR) has been contracted by a 'third party' to research and issue this report and is expected to receive thirty thousand dollars to distribute this report."

41.    The bioTech report is a pseudonym for TFG used to mask the fact that Shrewder and TFG were paid by ArTec for the promotional campaign and is not "an independent investor awareness publication" as stated in the fax.

42.    The TR disclaimer misrepresented the compensation that Shrewder and TFG received, the fact that they had already received this compensation, and the fact that their services had been contracted by an agent of ArTec and not a "third party."

43.    On November 9, 2004, the day before Shrewder and TFG began disseminating ArTec faxes, Shrewder's ArTec shares were worth approximately $70,500 based on the $0.47 closing price for ArTec shares that day. The value of Shrewder's stock plus the $5,000 cash he received far exceeded the $30,000 disclosed in his faxes.

44.     The disclaimer in the first fax blast even misrepresented what Shrewder negotiated for his compensation — 150,000 shares or a combination of stock and cash equal to $100,000.  As such, Shrewder knew that the statements about his compensation were false when made.

45.     Prior to the December fax blast campaign, Shrewder was paid an additional 600,000 shares of stock, which was worth far more than the $30,000 disclosed in his faxes.

**B.     The ArTec Faxes Falsely Asserted That They Were Partially Based on ArTec's SEC Filings and "Articles" Written About ArTec**

46.     The disclaimers in the ArTec faxes falsely asserted that their analysis was based in part on SEC filings.  ArTec, however, did not file reports with the SEC.

47.     This false statement is material because SEC filers must provide annual audited financial statements, quarterly un-audited filings, and comply with numerous rules and regulations that taken together give investors comfort that the issuer is a legitimate going concern.  ArTec, however, had not filed anything with the SEC, had never prepared an audited financial statement, and therefore was not subject to certain SEC rules and regulations.

48.     The disclaimers also purported to rely upon articles written about ArTec. "Articles" suggested that outside third parties were aware of and had written about the company rather than advertisements paid for by ArTec.

11

**C.     The ArTec Faxes Failed to Disclose That Shrewder Was Actively Selling ArTec Shares While He Was Recommending That Investors Accumulate ArTec Shares**

49.     The disclaimers in all three versions of the ArTec faxes indicated that (TR) "may from time to time buy and/or sell common shares." It did not, however, disclose that Shrewder was actively trading shares during the period of time when Shrewder and TFG caused these faxes to be distributed.

50.     Shrewder bought and sold ArTec shares in three different accounts in the wake of disseminating the faxes. All of his stock sales were at a price far lower than the target price to which he suggested investors accumulate the stock.

51.     Shrewder was actively selling ArTec shares for less than $0.50 while he was recommending that his "subscribers" accumulate ArTec shares until the price reached between $2.00 and $4.00.

**D.     Other Material Misrepresentations in the Faxes**

52.     Each of the three versions of the ArTec faxes had a box at the top right-hand corner of the "bioTech Report" page that indicated recent price, public float, an "accumulate to" price target, and that ArTec was a "STRONG BUY OPPORTUNITY!!!"

53.     The faxes falsely stated that the float was far less than it really was. In two of the three faxes, the float was listed as 1.5 million, and in one version it was listed as only 1 million shares.

54.     Shrewder knew this was false when he published it. The actual public float of ArTec shares at that time was at least 8.6 million shares.

55.     All three versions had a box entitled "Reasons to own ATKJ." One of the reasons given to own ArTec was that ATKJ supposedly was a "new issue w/tight float."

12

56.     Shrewder knew that the misrepresentation of ArTec securities' public float would mislead investors into thinking that the shares of ArTec were more valuable than they were because it appeared that there were a relatively low number of available ArTec shares.  In fact, faxes stated that this "tight float" offered a "ground floor opportunity!" to own this stock.

57.     All three versions of the ArTec faxes indicated that ArTec is a "strong buy opportunity," with a price target of either $2.00 or $4.00, and a "potential 'pre-FDA approved' valuation in the millions."  Shrewder has acknowledged that there were no professional analysts that made any such recommendation nor was there any real analysis that went into the valuations.

58.     The disclaimer in all three versions of the ArTec faxes indicated that the recommendations made about ArTec were based "on independent analysis."  The only analysis Shrewder performed on ArTec in authoring the faxes was based on ArTec's press releases, its website and conversations Shrewder had with ArTec's president, Dr. Shinn.  None of these sources were "independent" of ArTec in any form.

59.     The representations in the faxes by Shrewder of an "independent analysis" were material because they gave the faxes an aura of reliability that simply did not exist. Shrewder's claims of independence intentionally mislead potential investors into thinking that, although Shrewder might have been paid, some other "independent analysis" of the stock was done when, in fact, it was not.

60.     Shrewder's faxes also falsely stated that ArTec was "nearly debt free."  At the time he sent his faxes out, ArTec's debt was in excess of three million dollars.

**III.    Shrewder Engaged in Manipulative Trading Activity in ArTec**

    **A.    Shrewder Engaged in Day Trading to Falsely Create The Appearance Of Trading Volume During His Fax Blasting Campaign**

61.    While sending out millions of faxes promoting ArTec, Shrewder engaged in a series of day trades designed to initiate and maintain the false appearance of additional volume in ArTec stock.

62.    Between November 10, 2004 and November 23, 2004, during which time millions of faxes were going out at Shrewder's direction, Shrewder executed several buy and sell orders each day in his brokerage account at an online firm called "myTrack" in an effort to create volume.

63.    Shrewder's activities had an immediate and substantial impact on ArTec's price and volume during that period.

64.    On November 19, 2004, in an e-mail message to Leshem and Shrewder, ArTec COO Knight wrote, among other things: "Our volume is building and that's GREAT. Keep up the GOOD WORK."

65.    In a reply e-mail, Shrewder writes: "it would benefit all of us to 'identify who is selling' . . . as they will slowly BUT surely dismantle what is left of ou[r] market...." Shrewder continues "people BUY these stocks because they run and represent an opportunity to reap 'short term' profits......this will not occur w/the amt of pressure the stock is receiving now!!!!!"

66.    Based on his communications with Shrewder, Leshem identified one shareholder who was selling ArTec.  Leshem telephoned the investor and asked him to buy more shares to support the falling market.

67.     Immediately before the December 15 faxes began going out, and continuing throughout the day of December 15, 2004, Shrewder again executed several buy and sell orders in his brokerage account at an online firm called "myTrack" in an effort to create volume.  On December 15, 2004, Shrewder lost $822.24 and incurred nearly $117 in commissions on these trades.

68.     On December 16, 2004, Shrewder continued this trading activity in that brokerage account, this time buying far more than he sold in an attempt to increase price and volume.

69.     Shrewder's activities had an immediate and substantial impact on ArTec's price and volume that day.  Prior to beginning the December 15 fax campaign, ArTec had only traded 26,500 shares at $0.25 on December 13 and 17,000 shares at $0.25 on December 14.  On December 15, 2004, ArTec closed at $0.40 on 292,865 shares traded.  On December 16, 2004, ArTec closed at $0.44 on 379,300 shares traded.

**B.      Shrewder Engaged in Scalping**

70.     At the same time Shrewder conducted the trading in his myTrack account, Shrewder was selling a large volume of ArTec stock in a separate brokerage account into which he had received the 750,000 ArTec shares that was part of his compensation.

71.     In mid-December, Shrewder sold his ArTec stock into the rise in price and increase in volume caused in whole or in part by his faxes and his manipulative trading, a practice commonly known as scalping.

72.     On December 15, Shrewder had Protus begin faxing at 2:58 a.m. EST and continue until he had distributed over 450,000 faxes by 3:13 a.m. EST.  The faxes

included a headline that read: "ARTEC COMPLETES PROTOCOL FOR FDA PHASE I EFFICACY TESTING OF TUBERCIN."

73.     Despite urging investors to accumulate the stock until it reached a price of $2.00, at 4:00 p.m. on December 15, Shrewder sold 81,900 shares of ArTec from his SAMCO brokerage account – the account in which he deposited his payment of 600,000 ArTec shares – at a price of $0.388 without adequately disclosing this fact in his faxes.

74.     On December 16, Shrewder sold another 112,000 shares at $0.41 (well below the $2.00 target price) from the SAMCO account without adequately disclosing this fact in his faxes.

75.     During the course of his ArTec campaign Shrewder unlawfully profited in an amount in excess of $140,000.

### IV.     Shrewder's Conduct With Respect To ArTec is Part Of A Pattern Or Practice By Shrewder To Improperly Manipulate Several OTC Stocks.

#### A.     Shrewder's Fax Blasting for Other Issuers

76.     ArTec is not the only stock that Shrewder and TFG promoted.  From April 2004 through July 2005, Shrewder and TFG disseminated over 87 million stock-related faxes.

77.     Shrewder conducted fax blasting campaigns – similar to the ArTec campaign – for at least nine other over-the-counter stocks from April to December 2004. For each of these nine other companies, he sold his shares well below the price to which he was suggesting the investing public accumulate without adequately disclosing that fact just as he had with ArTec.

16

78.     As in ArTec, Shrewder gave the security a "strong buy" or "strong buy opportunity" recommendation.

79.     In each instance, as in ArTec, Shrewder received shares prior to his fax blasting activities. Shrewder's repeated practice of faxing material on companies promoting them as "buy" or "strong buy" opportunities in exchange for stock which he then sold demonstrated that ArTec was not, in fact, an isolated occurrence but a pattern or practice.

**B.      Shrewder Engaged in Manipulative Trading Activity in Sequoia**

80.     One of the nine issuers referred to above is Sequoia Interests Corporation ("Sequoia" or "SQNC," its OTC trading symbol). Sequoia retained Shrewder and TFG to provide promotional services.

81.     In promoting Sequoia, Shrewder's faxes and manipulative trading activity mirrored the fraudulent practices and patterns that Shrewder carried out with ArTec.

82.     An April 2004 fax blast sent out by Shrewder was called "the Oil Report," which he describes as "A Premium Market Related Service."

83.     The fax touts that Sequoia's technology "offers real solution to U.S. dependency on foreign oil."

84.     The fax states that investors can learn more about the company by going to SEC filings. It also states that information was supplied by sources believed to be reliable such as SEC Filings. Sequoia, however, did not file reports with the SEC.

85.     As with ArTec, this fax also states that the stock is a "Strong Buy – OPPORTUNITY!!"

86.     As with ArTec, this fax uses a pseudonym for the publisher, this time "U.S. Oil Report (USOR)", misleadingly stating that it is an "independent investor awareness publication."

87.     As with ArTec, the facsimiles that Shrewder disseminated for Sequoia misrepresented the compensation he received for promoting Sequoia.  In a disclosure statement on the fax, Shrewder stated that his entity "is expected to receive Twenty five thousand dollars to issue this report on Sequoia Interests Corporation . . . ."

88.     In fact, Shrewder had already received 260,000 shares of Sequoia stock with a value at the time of $0.91, for a total of $236,000.  The market value of the Sequoia stock Shrewder received at the time he sent a fax blast on April 27, 2004, was approximately $226,000 – far more than the $25,000 stated in the disclosure.

89.     As he did with ArTec shares, Shrewder engaged in day trading in Sequoia stock designed to increase volume and create the appearance of market interest in that stock.

90.     After receiving the 260,000 Sequoia shares on April 7, 2004, Shrewder sent out faxes touting Sequoia, including the April 27, 2004, fax referenced above.  In that fax, Shrewder recommended accumulating Sequoia stock to $2.00 and exiting the stock at $5.00.

91.     As with ArTec, Shrewder sold the Sequoia stock he received at far less than the price he was recommending in his faxes.  From March 2004 to December 2004 Shrewder sold over 1.5 million shares of Sequoia stock at an average price of only $0.53 – far below the price he recommended in the April 27, 2004 fax.

18

92.     Through his sales of Sequoia stock, Shrewder made an unlawful profit of several hundred thousand dollars.

**V.     Leshem Violated His Penny Stock Bar**

93.     At all relevant times, Leshem was subject to the Commission's 1999 Cease and Desist Order, which, among other things, barred him from participation in penny stock offerings.

94.     At all relevant times, ArTec's common stock was a "penny stock." ArTec shares have never traded for five dollars or more, are not registered on a national exchange, are not issued by a registered investment company, and are not authorized for quotation on NASDAQ.

95.     ArTec securities also qualify as a penny stock because ArTec has been in existence for less than three years and has net tangible assets of less than $5,000,000. ArTec has been in existence since 2003 and, according to its unaudited financial statements for the periods from December 31, 2003, to August 31, 2005, ArTec never exceeded $60,000 in tangible assets.

96.     ArTec securities also qualify as a penny stock because ArTec has had average revenues of less than $6,000,000 for the last three years. ArTec's unaudited financial statements for the periods between December 31, 2003, and August 31, 2005, indicate ArTec had no income or sales and thus no revenue.

97.     Leshem's consulting engagement included promoting ArTec stock. ArTec hired Leshem to consult on a number of business matters, including introducing the company to financial public relations specialists. In this regard, he coordinated Shrewder's engagement and payment.

98.     Leshem also edited three ArTec press releases and rewrote the homepage narrative on ArTec's website.

99.     An ArTec shareholder, who was known as a "founding father" of ArTec, described Leshem as "one that's supposed to be trying to see that our stock is sold through his circle of people that he deals with, with other stockbrokers."

100.    ArTec's COO, Gerry Knight described Leshem's role as "instrumental in getting market-makers to help us promote the stock, or at least pursuing that . . . ."

101.    In an October 28, 2004 letter to the inventor of Tubercin, ArTec's CEO, Shinn summed up Leshem's efforts by referring to him as ArTec's "capital funding advisor." In this letter, Shinn explained that, "a group of people have been assembled under the direction of Miron Leshem and hired by ArTec to devote time in increasing ArTec exposure and market increase in the sales of ArTec shares."

102.    Leshem dealt directly with broker-dealers on behalf of ArTec and its shareholders. Leshem has testified that one part of his duties was "to assist in some operational matters pertaining to broker-dealers."

103.    Leshem advised Knight to have his associates—ArTec's original investors known as the "founding fathers"—open accounts at specific broker-dealers to assist in gaining more market makers.

104.    In his work for ArTec, on at least one occasion Leshem assisted ArTec's "founding fathers" deposit their shares with a broker-dealer.

105.    Leshem personally arranged for the processing of the shares used to pay Shrewder. Leshem emailed Shrewder that he was "introducing friendly market makers to provide more support."

20

106.    Leshem also arranged for a broker he knew at Park Financial Group to enter into a consulting agreement with ArTec, among other things, to become a market maker in ArTec stock.

107.    Leshem also contacted a shareholder of ArTec to convince him to purchase additional shares of stock to help slow the declining market in ArTec stock.

108.    Leshem received $8,000 and 300,000 ArTec shares as compensation for his consulting work.  He sold some of the ArTec shares he received for a profit.

109.    Leshem used bank and brokerage accounts in the name of Ananda to receive cash and stock related to his consulting work for ArTec.  At all relevant times, Leshem controlled these accounts.

110.    Based on the conduct above, Leshem participated in an offering of penny stock within the meaning of Exchange Act Section 15(b)(6)(C) by acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in ArTec, or inducing or attempting to induce the purchase or sale of ArTec.

### FIRST CLAIM FOR RELIEF
#### Violations of Section 17(b) of the Securities Act
#### (Defendants Shrewder and TFG)

111.    Paragraphs 1 through 110 are re-alleged and incorporated herein by reference.

112.    As described above, defendants Shrewder and TFG, by use of means or instrumentalities of interstate commerce or of the mails, gave publicity to a security for consideration received, directly or indirectly, from an issuer, without fully disclosing the receipt of such consideration and the amount thereof.

113.    By reason of the foregoing, defendants Shrewder and TFG each violated Exchange Act Section 17(b) [15 U.S.C. § 77q(b)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5
### (Defendants Shrewder and TFG)

114.    Paragraphs 1 through 113 are re-alleged and incorporated herein by reference.

115.    As described above, defendants Shrewder and TFG, by use of means or instrumentalities of interstate commerce or of the mails: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

116.    Defendants Shrewder and TFG knew or were reckless in not knowing of the facts and circumstances described above.

117.    By reason of the foregoing, defendants Shrewder and TFG each violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1)
### (Defendants Shrewder and TFG)

118.    Paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

119.    As described above, defendants Shrewder and TFG, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes or artifices to defraud.

120.    Defendants Shrewder and TFG acted knowingly, or recklessly in not knowing, with respect to the facts and circumstances described above.

121.    By reason of the foregoing, defendants Shrewder and TFG each violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### FOURTH CLAIM FOR RELIEF
#### Violations of Securities Act Section 17(a)(2) and (3)
#### (Defendants Shrewder and TFG)

122.    Paragraphs 1 through 121 are re-alleged and incorporated herein by reference.

123.    As described above, defendants Shrewder and TFG, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) obtained money or property by means of untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser.

124.    Defendants Shrewder and TFG acted knowingly, recklessly in not knowing, or negligently with respect to the facts and circumstances described above.

125. By reason of the foregoing, defendants Shrewder and TFG each violated Securities Act Section 17(a)(2) and (3) [15 U.S.C. § 77q(a)(2) and (3)].

### FIFTH CLAIM FOR RELIEF
### Violation of Exchange Act Section 15(b)(6)(B)(i)
### (Defendant Leshem)

126. Paragraphs 1 through 125 are re-alleged and incorporated herein by reference.

127. As described above, defendant Leshem, having been barred from participating in an offering of penny stock by Commission Order on March 22, 1999, and, without consent of the Commission, willfully participated in an offering of penny stock in contravention of such order.

128. By reason of the foregoing, defendant Leshem violated Securities Act Section 15(b)(6)(B)(i).

### SIXTH CLAIM FOR RELIEF
### (Relief defendant Ananda)

129. Paragraphs 1 through 128 are re-alleged and incorporated herein by reference.

130. In the manner described above, relief defendant Ananda received ill-gotten gains for which it gave no consideration and to which it has no legitimate claim.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

### I.

Finding that each of the defendants committed the violations alleged above;

24

## II.

A.      Permanently enjoining defendant Shrewder from further violations of Sections 17(a) and 17(b) of the Securities Act [15 U.S.C. §§ 77q(a) and 77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

B.      Permanently enjoining defendant TFG from further violations of Sections 17(a) and 17(b) of the Securities Act [15 U.S.C. §§ 77q(a) and 77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

C.      Permanently enjoining defendant Leshem from further violations of Exchange Act Section 15(b)(6)(B)(i);

## III.

Permanently barring defendants Shrewder and Leshem from participation in any offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  All equity stocks are penny stock unless exempted per Exchange Act Section 3(a)(51) [15 U.S.C. § 78c (a)(51)(A)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1];

## IV.

Ordering defendants Shrewder, TFG, Leshem and relief defendant Ananda to provide an accounting and to disgorge any ill-gotten gains and/or unjust enrichment realized by each of them, plus prejudgment interest thereon;

## V.

Ordering defendants Shrewder, TFG and Leshem to pay appropriate civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. §77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)];

## VI.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

## VII.

Granting such other relief as the Court deems just or appropriate.

**Plaintiff demands a trial by jury.**

Respectfully submitted,

Stephen L. Cohen, Trial Counsel (Bar #128317)
Peter H. Bresnan
C. Joshua Felker
Samuel J. Draddy
Kevin Muhlendorf

Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel: (202) 551-4472 (Cohen)
Fax: (202) 551-9245
E-mail:  cohens@sec.gov

Dated: February 6, 2006

26

06-80126

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Securities and Exchange Commission

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stephen L. Cohen, 100 F Street, N.E., Washington, D.C. 20549-4030
(202)551-4472

## DEFENDANTS

John R. Shrewder, The Franklin Group, Inc., and Ashley Miron Leshem, and Ananda Partners, Inc. (relief defendant)

County of Residence of First Listed Defendant   Tulsa, OK
(IN U.S. PLAINTIFF CASES ONLY)

NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

(Shrewder) Ronald Kaufman, Kaufman & Associates, PLLC, 624 S. Boston Ave., 10th Floor, Tulsa, OK 74119 (918)584-4463

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☑ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

Palm Beach 9:06cv80126 | KLR | Vitura

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 1410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1  Original Proceeding   ☐ 2  Removed from State Court   ☐ 3  Re-filed- (see VI below)   ☐ 4  Reinstated or Reopened   ☐ 5  Transferred from another district (specify)   ☐ 6  Multidistrict Litigation   ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page)

a) Re-filed Case  ☐ YES  ☐ NO     b) Related Cases  ☐ YES  ☐ NO

JUDGE                           DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

15 USC 77q; 15 USC 78j

LENGTH OF TRIAL via 5-8 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   *Stephen L. Cohen*

DATE   2/6/06

**FOR OFFICE USE ONLY**

AMOUNT                 RECEIPT #                 IFP